KANSAS CITY SOUTHERN INDUSTRIES, INC.,
PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 18653-87, 17654-88.     Filed March 5, 1992.

*J. Glenn Hahn, David E. Bass, David N. Zimmerman, Walter R. Randall, Mara D. Sprecker,* and *Robert C. Hunter,* for petitioner in both docket Nos.

*Nancy S. Barclay,* for petitioner in docket No. 18653-87.

*Lewis R. Carluzzo* and *Robert M. Fowler,* for respondent.

COHEN, *Judge:* In separate notices of deficiency, respondent determined the following deficiencies in petitioner's Federal income taxes:

| Docket No. | Year | Deficiency |
| --- | --- | --- |
| 18653-87 | 1978 | $42,274 |
| | 1979 | 2,771,434 |
| 17654-88 | 1980 | 4,129,634 |
| | 1981 | 593,299 |
| | 1982 | 1,434,129 |
| | 1983 | 9,428,727 |

After concessions, the issues remaining for decision are whether it was an abuse of respondent's discretion to deny petitioner's application to revoke an election to amortize petitioner's railroad grading under section 185(c); whether deposits received by petitioner for the construction of side-tracks in accordance with industry track agreements constitute income to petitioner during the years in issue; and whether

computer software purchased by petitioner constituted tangible personal property eligible for investment tax credit under section 38. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner Kansas City Southern Industries, Inc. (Industries or petitioner), is a corporation duly organized and existing under the laws of the State of Delaware, with its principal office in Kansas City, Missouri. At all material times, Industries was a holding company and the common parent of a group that filed consolidated Federal income tax returns. At all material times, Industries maintained its books and records and filed its Federal income tax returns on a calendar year, accrual basis.

During the years in issue, Industries' railroad operations were conducted principally through two of its subsidiaries, Kansas City Southern Railway Co. (Railway) and Louisiana & Arkansas Railway Co. (L&A). Railway and L&A were engaged in the business of transporting goods and commodities as a rail common carrier for hire and served the States of Missouri, Kansas, Arkansas, Oklahoma, Louisiana, and Texas. Railway operated 894.16 miles of mainline track, and L&A operated 745.51 miles of mainline track.

*Grading*

As used in this opinion, the term "grading" refers to the addition of soil to or the removal of soil from a roadway for the purpose of developing suitable grade and support upon which ballast, ties, and track are laid. The term also includes the preparatory operations of clearing and grubbing, which must be performed prior to the actual grading of the soil, and construction of protection for the roadway, which is performed after the actual grading is completed.

On its Federal income tax returns for 1962 through 1969, petitioner claimed investment tax credits on grading additions

placed in service during those taxable years. Those years were at issue in the cases at docket Nos. 971-72, 974-72, and 4788-73. In those cases, petitioner also claimed depreciation of grading placed in service by Railway and L&A during the years 1962 through 1969. The cases at docket Nos. 971-72, 974-72, and 4788-73 were tried before the Tax Court in November 1975 and May 1976.

As more fully discussed in the opinion below, in 1969, Congress repealed the investment tax credit and enacted section 185(c), permitting a taxpayer to elect to amortize railroad grading. On its corporate tax return for 1970, filed in 1971, petitioner made such an election for the taxable years ended December 31, 1970, through December 31, 1976. In 1971, Congress reinstated the investment tax credit.

On or about December 13, 1977, petitioner filed an application to revoke section 185(c) election (the application), seeking to revoke the election for the taxable year ending December 31, 1977, and subsequent taxable years. The application set forth the following reasons for petitioner's requested revocation of its election:

> The issue of the amortization of taxpayer's post-1968 and pre-1969 railroad grading with respect to the taxable years ended December 31, 1962 to December 31, 1969, inclusive, is presently awaiting opinion and decision before the United States Tax Court in *Kansas City Southern Railway Company, et al. v. Commissioner of Internal Revenue,* Docket Nos. 971-72, 974-72, and 4788-73. Sections 185(c) and 185(d) are not applicable to the taxable years before the Tax Court. The Section 38 investment credit issue with respect to the railroad grading additions during the taxable years in issue is also before the Tax Court. Submission of briefs was completed September 14, 1977.

> Section 185(h) precludes the treatment as Section 38 property of grading which is eligible to be amortized under Section 185. It is taxpayer's present opinion that the issue of investment credit with respect to post-1961 grading additions will be resolved favorably to the taxpayer in the Tax Court case above referred to. It is therefore taxpayer's desire to revoke its Section 185(c) election in order to claim Section 38 investment credit with respect to grading additions on its income tax returns for the taxable years ended December 31, 1977, and subsequent.

The engineering and valuation branch of the Internal Revenue Service (the IRS) had responsibility to consider and act upon such applications with respect to railroad grading.

By letter dated March 1, 1978, petitioner requested that the IRS confirm petitioner's understanding that action on petition-

er's application would be indefinitely suspended, with the express understanding that:

1. Industries may restore the Application to active consideration at any time by filing a written request; and
2. If the Commissioner takes favorable action upon the Application at such time, it will be retroactive, *i.e.*, the revocation will be effective for the taxable year ended December 31, 1977, and subsequent taxable years.

By letter dated March 10, 1978, under the signature of Geoffrey J. Taylor (Taylor), chief of the engineering and valuation branch, the IRS confirmed petitioner's understanding as follows:

Pursuant to your telephone conversation of February 23, 1978, with Messrs. F.W. Bone and A.H. Galbraith and your written response of March 1, 1978, this letter will confirm our understanding that we should suspend action for the present on the request of Kansas City Southern Industries, Inc., for permission to revoke its prior election of section 185 for amortization of its railroad grading assets, with such revocation to be effective with the taxable year ending December 31, 1977, and subsequent years. It is further understood that the present request for permission to revoke the section 185 election will be reopened at a later time, with the same effective date for revocation, when you so request by letter.

The agreement between petitioner and the IRS to suspend action on petitioner's application was made for the purpose of allowing additional time for the Tax Court to render its decision on the grading issues previously tried for the taxable years 1962 through 1969. On June 30, 1981, the Court rendered its opinion on petitioner's 1962 through 1969 grading issues in *Kansas City Southern Ry. v. Commissioner,* 76 T.C. 1067 (1981).

By letter dated March 15, 1983, petitioner requested that its application be restored to active consideration with said revocation to be effective for the taxable year ended December 31, 1977, and subsequent taxable years. Petitioner submitted its request for restoration of its application to revoke the section 185(c) election because of the Court's decision in favor of petitioner with respect to its 1962 through 1969 grading issues.

On April 15, 1983, Charles O'Malley (O'Malley), an employee of the engineering and valuation branch from July 1978 through September 1, 1983, advised petitioner's counsel, J. Glenn Hahn (Hahn), that the IRS would not act favorably

upon petitioner's application. On or about April 15, 1983, petitioner requested a conference in Washington, D.C., to discuss with the IRS its proposed denial of petitioner's request for revocation of the section 185(c) election.

On May 4, 1983, Walter W. Howland, a representative of petitioner, and Hahn met with Noel J. Sheehan (Sheehan) and O'Malley, representatives of the IRS, at the National Office of the IRS in Washington, D.C., to discuss the proposed denial of petitioner's request to revoke its section 185(c) election. Petitioner advised the IRS representatives at that meeting that its position was that grading was depreciable property and that it would be eligible for the investment tax credit if petitioner was allowed to revoke its section 185(c) election. Petitioner further advised the IRS representatives of its intent to claim an investment tax credit on grading if its application was granted. Petitioner was advised that it was the IRS position that grading was not eligible for the investment tax credit. The IRS employees indicated that they were aware of the 1981 Tax Court decision in favor of petitioner with respect to petitioner's 1962 through 1969 grading issues.

The IRS did not, at any time, discuss or propose any conditions or limitations upon which petitioner's application would have been granted.

By letter dated August 11, 1983, the IRS formally denied petitioner's application. That letter set forth the IRS view as follows:

> Since enactment of section 185 of the Code taxpayers have had two alternatives for recovering the cost of railroad grading and tunnel bores incurred after 1968. The first is to recover the entire cost of the property at the time of its retirement or abandonment, the second is to ratably deduct the cost over a 50-year life as provided by section 185 of the Code with no deduction allowable for retirement or abandonment unless the retirement or abandonment is attributable primarily to fire, storm or other casualty. * * *

The stated reason for denial of petitioner's application was set forth as follows:

> The taxpayer made an effective election on its 1970 calendar year income tax return to amortize the cost of qualified property under the provisions of section 185(c) for 1970 and subsequent tax years. Taxpayer now requests revocation of this election in order to claim investment credit with respect to additions of this property. Inasmuch as investment credit is not available to property that is eligible for amortization under section 185 of the Code,

the taxpayer's request necessarily implies that the property would be treated as depreciable. Granting the taxpayer's request to revoke the election would, therefore, amount to facilitating the taxpayer's adoption of a method of cost recovery that is not consistent with either of the acceptable methods discussed above. Permission is, therefore, not granted to the taxpayer to revoke its election under section 185(c) to amortize the cost of railroad grading and tunnel bores.

O'Malley had the primary responsibility for making the initial determination on whether to grant or deny petitioner's application. O'Malley prepared the original draft of the August 11, 1983, letter denying petitioner's application. The draft was then reviewed by O'Malley's immediate supervisor, Sheehan, a group chief in the engineering and valuation branch from 1977 through 1983. Sheehan signed the letter on behalf of Taylor.

Not having obtained IRS consent to revoke petitioner's section 185(c) election, petitioner continued to claim amortization pursuant to section 185(c) on its Federal income tax returns for the years in issue.

Pursuant to the stipulation of the parties, except with respect to the effect of section 185, if any, petitioner is properly entitled to depreciation deductions under the double-declining balance method of depreciation with respect to Railway's and L&A's post-1976 grading in the following amounts:

| Year | Amount |
|------|--------|
| 1978 | $17,825 |
| 1979 | 41,620 |
| 1980 | 100,402 |
| 1981 | 198,290 |
| 1982 | 269,630 |
| 1983 | 280,215 |

Petitioner claimed on its Federal income tax returns for 1978 through 1981, as qualified investments under section 46, the total cost of Railway's and L&A's respective grading placed in service for said taxable years.

Petitioner is entitled to treat the cost of its grading as "new section 38 property" and is entitled to qualified investment under section 46 and investment tax credits under section 38 with respect to the grading placed in service during the years in issue in the following amounts:

| Year | Qualified investment | Investment credit |
|---|---|---|
| Carryover from 1977 | - - - | $58,583 |
| 1978 | $292,010 | 29,201 |
| 1979 | 1,886,794 | 188,679 |
| 1980 | 3,703,988 | 370,399 |
| 1981 | 5,947,143 | 594,714 |
| 1982 | 1,362,073 | 136,207 |
| 1983 | 195,756 | 19,576 |
| | 13,387,764 | 1,397,359 |

## Sidetrack Deposits

A "sidetrack" is a segment of a railroad track connecting an industry facility to a railroad's running track. The term "industry track agreement" refers to a written agreement between existing or potential industry shippers and the carrier railroad for the construction, maintenance, and operation of a sidetrack. A "headblock" is a point on the railroad's running track where a switch is installed that allows railcars to be diverted from the running track onto the sidetrack.

From time to time, prior to and during the years in issue, as part of the conduct of their railroad transportation business, Railway and L&A entered into certain industry track agreements with various shippers. At issue in these cases are 39 industry track agreements entered into by Railway and L&A with various industry shippers.

All of the industry track agreements entered into by Railway and L&A and the various industry shippers at all pertinent times prior to and during the years in issue contained substantially identical terms and provisions, except for slight modifications arising as a result of negotiations with certain industry shippers, which modifications are not material to the resolution of the issues in these cases. All of the industry track agreements contained the following provisions relating to:

(a) Identification of the parties thereto;

(b) industry's obligation to provide a right-of-way sufficient for proper construction, maintenance, and operation of the sidetrack;

(c) the costs of construction of the sidetrack and refund of the actual cost of construction to the industry;

(d) obligations for maintenance of the sidetrack;

(e) necessary change, rearrangement, extension, or enlargement of the sidetrack;

(f) title and ownership of the sidetrack;

(g) Railway's or L&A's rights to use the sidetrack;

(h) industry's obligation to maintain certain clearances and keep the sidetrack free from obstructions;

(i) industry's obligation to indemnify Railway or L&A for claims arising from loss or damage as a result of operation of the sidetrack;

(j) industry's obligation to maintain continuous operations;

(k) liability for damages resulting from discontinuance of operation of the sidetrack; and

(l) cancellation and termination of the agreement and Railway's or L&A's right to remove components of the sidetrack.

The industry track agreements typically provided that Railway or L&A, at the industry's expense, would furnish labor and material, exclusive of grading, drainage, and subgrade stabilization, for construction of that portion of the sidetrack from the headblock on Railway's or L&A's line to the railroad's property right-of-way line.

The industry track agreements customarily provided that the industry would, prior to construction, deposit with Railway or L&A a sum representing the estimated cost of construction of that portion of the sidetrack from the headblock on Railway's or L&A's running line to the railroad's property right-of-way line. If the actual cost of the work covered by the deposit was more than the estimate, the industry agreed to pay the additional cost upon presentation of a bill therefor by Railway or L&A. If the actual cost of the work was less than the amount deposited, the difference would be refunded by Railway or L&A to the industry upon completion of the work. The industry track agreements customarily provided that Railway or L&A would periodically refund to the industry, at a specified rate, the actual cost of constructing that portion of the sidetrack from the headblock to the railroad's property right-of-way line.

An industry track agreement between L&A and Grocery Supply Co. dated August 17, 1978, contained a refund provision typical of those contained in the industry track agreements for 1978 through 1981. The agreement provided for refund to the shipper of the amount deposited at the rate of $10 per car on cars originating on or destined to the subject sidetrack, provided that the mainline haul revenue with respect thereto amounted to $200 or more per car. The term "mainline haul revenue" means revenue from freight shipments originating on or destined to a point on Railway's or L&A's mainline.

An industry track agreement between Railway and P.Q. Corp. dated July 13, 1982, contained a refund provision typical of those contained in the industry track agreements entered into for 1982 and 1983. The agreement provides for refund of the amount deposited at the following rate:

| Rate (per car) | Revenue (per car) |
|---|---|
| $10 | $200.00 to 399.99 |
| 20 | 400.00 to 599.99 |
| 30 | 600.00 to 799.99 |
| 40 | 800.00 to 999.99 |
| 50 | Over $1,000.00 |

The industry track agreements customarily provided that refunds would be made quarterly on the basis of statements submitted by the industry and verified by Railway or L&A of cars handled over the sidetrack.

The industry track agreements, among other things, contained the following provisions:

Failure to Operate Plant.—9. If Industry shall fail for a period of three consecutive months in any period of twelve months to operate and carry on said business therein, to accommodate which the said sidetrack is to be operated, or if Industry shall fail or refuse for thirty days after demand made therefor to comply with and carry out any of the covenants or agreements of the Industry herein, or if Industry shall dispose of said business or assign this contract or any right or interest herein or hereunder without the written consent of the Railway Company, then said Railway Company may, at its option expressed in writing, terminate its obligation herein further to operate said sidetrack, and at its option may take up and remove said sidetrack [only that portion owned by Railway Co.], and any notice of such option shall be sufficiently given and expressed if mailed in an envelope addressed to Industry at the aforesaid place of business or left thereat with any person in charge; but no termination shall release Industry from any liability which may have attached or accrued previous to or at the time of such termination, nor from any obligation of indemnity herein contained, or covenant to hold Railway Company harmless or to pay damages or judgments.

Discontinuance.—10. Any and all loss or damage sustained in conse-quence of any temporary or permanent elimination of said sidetrack, shall be assumed by Industry, or in event the disposition of the property of Railway Company or its future use or development shall make it impractica-ble in the judgment of the Chief Engineer of Railway Company to continue the connection, Industry hereby waives any and all claims therefor.

Cancellation, Termination and Removal.—11. This agreement shall be terminable upon thirty (30) days' written notice from either party to the other.

Upon termination of this agreement Railway Company shall have the right to enter upon the property of Industry and remove any or all of the material owned by Railway Company, and shall not be liable to account in any way to anyone for any monies paid or expended on account of any of the track or tracks covered by this agreement, nor for any damages resulting from the removal of any or all of the material owned by Railway Company. In the event the rules and regulations of the Railroad Commission of the aforesaid state (in which said sidetrack is located), now or hereafter, require that no siding, switches or spur tracks shall be removed without the approval or consent of said Railroad Commission, then and in that case, it is hereby expressly agreed that Industry will use its best efforts to secure the approval or consent of said Railroad Commission for the removal of said sidetrack upon the written request of Railway Company so to do. If Industry fails, refuses or neglects to secure the approval or consent of such Railroad Commission for the removal of said sidetrack [only that portion owned by Railway Co.] for the period of sixty days after receiving a request in writing so to do from Railway Company, then it is hereby expressly agreed that Railway Company may remove said sidetrack; and Industry hereby expressly agrees to protect, indemnify and forever save harmless Railway Company from all claims and all liability arising from or by reason of any action, complaint or proceeding instituted in any court or before such Railroad Commission because of the removal of said track.

Until terminated as hereinbefore provided, this agreement shall inure to the benefit of and be binding upon parties hereto, their heirs, executors, administrators, successors and assigns.

During the years in issue, Railway and L&A refunded deposits pursuant to industry track agreements with various industry shippers in the following total amounts:

| Year of refund | Total refunds of deposits |
| --- | --- |
| 1978 | - - - |
| 1979 | $13,070.00 |
| 1980 | 24,620.00 |
| 1981 | 32,990.00 |
| 1982 | 59,085.58 |
| 1983 | 58,594.31 |
| Total | 188,359.89 |

The industry track agreements customarily provided that deposits would be refunded within 5 years from the date of completion of construction of the sidetrack. Any balance of the deposit remaining unrefunded at the end of such 5-year period could be forfeited to Railway or L&A. The refund period under the industry track agreements was extended approximately 50 percent of the time.

Although petitioner occasionally extended the time in which shippers could seek a refund of their sidetrack deposit, such an extension of time was a voluntary action by petitioner not required by the industry track agreement.

Not all industry shippers were required to enter into industry track agreements and make deposits for the construction of sidetracks. A decision whether to require an industry shipper to enter into an industry track agreement was based on the business potential of the shipper.

During the years in issue, Railway and L&A were required to maintain, and they did maintain, their books of account, including those relating to sidetrack deposits, under the uniform system of accounts for railroad companies prescribed by the Interstate Commerce Commission (as revised to October 1, 1979) (ICC Uniform System of Accounts) in effect during the years in issue.

Railway's and L&A's accounting for sidetrack deposits involved the following account classifications prescribed by the ICC Uniform System of Accounts:

| Account No. | Title |
|---|---|
| 701 | Cash |
| 731 | Road and equipment property |
| 782 | Other liabilities |
| 784 | Other deferred credits |

Railway's and L&A's account No. 701, cash, was a general ledger current asset account, supported by subsidiary or subaccounts, including subaccount No. 70101, cash.

Railway's and L&A's account No. 731, road and equipment property, was a general ledger fixed asset account, supported by subsidiary or subaccounts, including subaccount No. 73101, road property, and subaccount No. 73190, construction in progress.

Railway's and L&A's account No. 782, other liabilities, was a general ledger liability account, supported by subaccounts, including subaccount No. 78201, deposits on industrial tracks.

Railway's and L&A's account No. 784, other deferred credits, was a general ledger account supported by subaccounts, including subaccount No. 78404, suspense.

At all material times prior to and during the years in issue, all amounts originally received by Railway and L&A under the industry track agreements were recorded on their books as a

debit to account No. 70101, cash, and a credit to account No. 78404, other deferred credits/suspense. The cost of construction of the sidetrack was recorded on the books of petitioner as a debit to account No. 73190, construction in progress, and a credit to account No. 70101, cash.

Upon completion of construction of the sidetrack, a completion report was prepared by Railway's or L&A's engineering department setting forth the actual cost of construction of such sidetrack; this completion report was then forwarded to Railway's or L&A's industrial department and accounting department for approval. Upon approval of the completion report, the accounting department compared the actual cost of construction of the sidetrack with the amount deposited by the industry.

During the years in issue, petitioner's railroads, upon completion of sidetrack construction projects and approval of the completion reports for such projects, credited account No. 78201, deposits on industrial tracks, in the following total amounts:

| Year | Amount |
|------|--------|
| 1978 | $50,658.19 |
| 1979 | 279,015.51 |
| 1980 | 37,002.22 |
| 1981 | 131,243.00 |
| 1982 | 370,459.93 |
| 1983 | 87,451.70 |

Petitioner had full use of the funds deposited by the shipper under the respective industry track agreements. The funds were commingled with petitioner's other funds in a general bank account. Petitioner paid no interest on any refunds made to the shippers under the respective industry track agreements.

*Computer Software*

During the taxable years 1976, 1977, 1980, 1981, 1982, and 1983, petitioner and certain of its subsidiaries purchased computer software for use in their respective trades or businesses. The computer software consisted of magnetic tapes or disks containing programs compatible with petitioner's computers. Software designed by and acquired from Systec Data Management, Inc. (Systec), a member of peti-

tioner's consolidated group, was used for "mainline business applications" and was owned by petitioner or its subsidiary acquiring the software. Software obtained from third parties was for general purpose business applications and could not be resold without violating the vendor's license rights.

OPINION

Each of the three issues set forth at the beginning of our opinion has, to some extent, been the subject of at least one prior opinion of this Court. Our resolution of each issue is controlled by those prior opinions, and we have found no reason to either reconsider or reject them.

## Grading Adjustments

The grading issues in these cases arise out of congressional action of repealing the investment tax credit in the Tax Reform Act of 1969, Pub. L. 91-172, sec. 703(a), 83 Stat. 660, and restoring it by the Revenue Act of 1971, Pub. L. 92-178, sec. 101, 85 Stat. 497 (1971). Concurrent with the 1969 repeal of the investment tax credit, section 185 was added to the Internal Revenue Code. Pub. L. 91-172, sec. 705(a), 83 Stat. 670. During the years in issue, the relevant parts of section 185 provided as follows:

SEC. 185. AMORTIZATION OF RAILROAD GRADING AND
           TUNNEL BORES.

(a) GENERAL RULE.—In the case of a domestic common carrier by railroad, the taxpayer shall, at his election, be entitled to a deduction with respect to the amortization of the adjusted basis (for determining gain) of his qualified railroad grading and tunnel bores. The amortization deduction provided by this section with respect to such property shall be in lieu of any depreciation deduction, or other amortization deduction, with respect to such property for any taxable year to which the election applies.

(b) AMOUNT OF DEDUCTION.—

(1) IN GENERAL.—The deduction allowable under subsection (a) for any taxable year shall be an amount determined by amortizing ratably over a period of 50 years the adjusted basis (for determining gain) of the qualified railroad grading and tunnel bores of the taxpayer. Such 50-year period shall commence with the first taxable year for which an election under this section is effective.

(2) SPECIAL RULE.—In the case of qualified railroad grading and tunnel bores placed in service after the beginning of the first taxable year for which an election under this section is effective, the 50-year period with

respect to such property shall begin with the year following the year the property is placed in service.

(c) ELECTION OF AMORTIZATION.—The election of the taxpayer to take the amortization deduction provided in subsection (a) may be made for any taxable year beginning after December 31, 1969. Such election shall be made by filing with the Secretary, in such manner, in such form, and within such time, as the Secretary may by regulations prescribe, a statement of such election. The election shall remain in effect for all taxable years subsequent to the first year for which it is effective and shall apply to all qualified railroad grading and tunnel bores of the taxpayer, unless, on application by the taxpayer, the Secretary permits him, subject to such conditions as the Secretary deems necessary, to revoke such election.

\* \* \* \* \* \* \*

(f) DEFINITIONS.—For purposes of this section—

(1) RAILROAD GRADING AND TUNNEL BORES.—The term "railroad grading and tunnel bores" means all improvements resulting from excavations (including tunneling), construction of embankments, clearings, diversions of roads and streams, sodding of slopes, and from similar work necessary to provide, construct, reconstruct, alter, protect, improve, replace, or restore a roadbed or right-of-way for railroad track. If expenditures for improvements described in the preceding sentence are incurred with respect to an existing roadbed or right-of-way for railroad track, such expenditures shall be considered, in applying this section, as costs for railroad grading or tunnel bores placed in service in the year in which such costs are incurred.

(2) QUALIFIED RAILROAD GRADING AND TUNNEL BORES.—The term "qualified railroad grading and tunnel bores" means railroad grading and tunnel bores the original use of which commences after December 31, 1968.

(3) PRE-1969 GRADING AND TUNNEL BORES.—The term "pre-1969 railroad grading and tunnel bores" means railroad grading and tunnel bores the original use of which commences before January 1, 1969.

\* \* \* \* \* \* \*

(h) INVESTMENT CREDIT NOT TO BE ALLOWED.—Property eligible to be amortized under this section shall not be treated as section 38 property within the meaning of section 48(a).

Petitioner's election under section 185(c) was filed in 1971, to be effective for the calendar taxable year 1970. Amortization under section 185 was claimed on returns filed for 1970 through 1976. During this period, petitioner and respondent were litigating depreciation and the investment tax credit claimed for 1962 through 1969.

In *Chesapeake & O. Ry. Co. v. Commissioner*, 64 T.C. 352 (1975), the Court sustained a taxpayer railroad's claims of depreciation of grading and tunnel bores for years prior to 1969. Commenting on section 185, the Court stated:

Our conclusion in this respect is consistent, we think, with the enactment of Code section 185 as part of the Tax Reform Act of 1969. Pub. L. 91-172, sec. 705(a), 83 Stat. 487, 672-673. By reason of section 185, railroad companies are now entitled to amortize over a 50-year period the cost of grading and tunnel bores which are first placed in service after 1968. Although the Commissioner would have us conclude from this that prior to 1969 such property was nondepreciable, this interpretation is not borne out by the relevant legislative history. The hypothesis upon which this section was enacted, and which it was designed to overcome, was that *because it was assumed that their useful lives could not be shown* grading and tunnel bores were not depreciable. Thus, the Senate Finance Committee, which introduced that provision, explained in its report (S. Rept. No. 91-552, 254 (1969)):

The committee amendments also provide railroads with the option to amortize railroad gradings and tunnel bores on the basis of a 50-year average life. Under present law, railroads capitalize these costs but have not been able to depreciate them because of uncertainties as to the length of their useful life.

See H. Rept. No. 91-782, 201-202 (1969). Where the railroad *has* been able to make the requisite showing of a reasonably determinable useful life, we are satisfied that Congress did not intend by its action to foreclose our consideration of this issue for grading and tunnel bores placed in service prior to 1969. Nor, on the other hand, is this legislation tantamount to a statutorily mandated 50-year useful life for such property.

[64 T.C. at 382-383; fn. ref. omitted.]

In December 1977, petitioner filed an application to revoke its election, effective for the taxable year ending December 31, 1977, and subsequent taxable years. Action on petitioner's application was deferred by agreement pending the Court's resolution of the issues for earlier years. The Court decided those issues in favor of petitioner in *Kansas City Southern Ry. v. Commissioner,* 76 T.C. 1067, 1152-1156 (1981).

Petitioner argues that the IRS denial of petitioner's application to revoke its section 185 election was arbitrary, capricious, and an abuse of discretion. Petitioner contends that the denial was motivated by the IRS desire to compel adherence to an administrative position that was contrary to judicial decisions against respondent and to foreclose a judicial determination that would follow petitioner's subsequent claims of depreciation and the investment tax credit. To the extent that respondent's position here is based on the existence of the election and the claim that the Court cannot compel respondent to allow revocation of the election, petitioner's theory has some support.

Respondent's position is threefold. First, she argues that the denial of petitioner's request to revoke its section 185(c) election was not arbitrary, capricious, or an abuse of discretion. According to respondent:

To the contrary, the record demonstrates that a considerable amount of time was spent on the request by respondent's employees, that the request was discussed with representatives of the petitioner on several occasions, that the response to the request was discussed among employees of the respondent and appropriately reviewed, that petitioner was never misled as to the outcome of the request, and that the reasons for the denial were disclosed to the petitioner.

Second, respondent argues that section 185(h), *supra* p. 255, precludes treatment of railroad grading as section 38 property and asks us to reconsider our position in *Carolina, Clinchfield & Ohio Ry. v. Commissioner,* 82 T.C. 888, 906-907 (1984), affd. 823 F.2d 33 (2d Cir. 1987), in which we held that property is not "eligible to be amortized" under section 185 until an election is filed. Third, respondent argues that this Court does not have the power to fashion a remedy on this issue, because the Court may not order the Commissioner to perform a discretionary act. It seems to us that these contentions should be addressed in reverse order.

In questioning the Court's power to fashion a remedy, respondent relies on *Capitol Federal Savings & Loan v. Commissioner,* 96 T.C. 204, 212 (1991), on appeal (10th Cir., May 10, 1991). Respondent acknowledges that, in *Capitol Federal Savings & Loan,* the Court concluded that, where a deficiency had been determined, the Court could in effect provide a remedy to the taxpayer by redetermining the deficiency. According to respondent:

In this case, unlike the situation in *Capitol Federal,* there is a statutory prohibition from claiming depreciation and investment tax credit on railroad grading since an election was in effect. The Court could only provide a remedy to the petitioner on this issue if it, in effect, ordered the respondent to consent to petitioner's request to revoke its prior election.

We are unpersuaded by this reasoning.

In this case, as in others, the remedy for abuse of discretion is to disregard the consequences of the Commissioner's action or refusal to act, not to order the Commissioner to perform an act. Respondent does not, and cannot, seriously contend that a decision to allow revocation of an election under section 185

is the type of action that is not subject to review. Thus, we conclude that review for abuse of discretion is available and effective in this case as in others. See, e.g., *Mailman v. Commissioner,* 91 T.C. 1079, 1083-1084 (1988) (discretion to waive additions to tax under section 6661); *Estate of Gardner v. Commissioner,* 82 T.C. 989, 994-1000 (1984) (denial of extension of time for filing a return containing an election).

With respect to respondent's second point, we reject the request that we reconsider our prior position and adopt a construction of section 185(h) "which would deny section 38 property status to all railroad grading, regardless of whether an election had been made." If, as respondent asserts, *Carolina, Clinchfield & Ohio Ry. v. Commissioner, supra,* is the only case addressing the issue, there is no authority casting doubt on the correctness of our resolution of the issue in that case.

Respondent states that the construction of the word "eligible" as used in section 185(h) was the last argument of several made by respondent and was "nevertheless addressed" by the Court in *Carolina, Clinchfield & Ohio Ry.* We do not see any significance to this point. Respondent also suggests a broad interpretation of the term "eligible". A dictionary definition of "eligible" that supports respondent's position is not inconsistent with the Court's conclusion in *Carolina, Clinchfield & Ohio Ry.* that "eligible" in section 185(h) means the subject of a valid election. There is no reason, therefore, to reconsider our position, and we decline to do so.

What we must decide, therefore, is whether abuse of discretion results from relying on the long-standing position on the depreciability of railroad grading when "it is well settled that respondent is not required to follow the decisions of the lower federal courts." As petitioner points out, the Commissioner's refusal to allow revocation of the election to amortize under section 185 would merely negate petitioner's right to amortize the grading. After the election was revoked, petitioner could actually claim depreciation and investment tax credit, and the Court would determine petitioner's entitlement to such depreciation and credit as a matter of substantive law. Presumably, the Court's decision would be consistent with its decision for earlier years in *Kansas City Southern Ry. v. Commissioner,* 76 T.C. 1067, 1152-1156 (1981). Simply stated,

petitioner's reason for seeking to revoke the election was to take advantage of evolving favorable precedent, and the Commissioner's position was intended to preclude petitioner's taking advantage of that favorable precedent.

Petitioner argues that, with respect to section 185(c):

legislative history shows Congress meant only to provide railroad taxpayers with some *alternative* method of cost recovery for railroad grading and tunnel bores. This result necessarily follows not only from the express provisions of the legislative history, but also from the fact that railroad taxpayers were given the option to elect in and, ostensibly, out of the provisions of Section 185. [Fn. ref. omitted.]

Petitioner's initial election, according to petitioner, was to avail petitioner of the statutorily permissible method of cost recovery after repeal of the investment tax credit provisions.

Respondent has provided no rationale or justification for rejecting petitioner's application to revoke its section 185(c) election other than the IRS position that grading was not depreciable. That position was repudiated by the Court in *Chesapeake & O. Ry. Co. v. Commissioner,* 64 T.C. 352 (1975), and *Kansas City Southern Ry. v. Commissioner, supra.*

In *Carolina, Clinchfield & O. Ry. v. Commissioner,* 82 T.C. at 908-910, we concluded that abuse of discretion occurred in ignoring a congressional mandate set forth in the statute and implemented in the regulations. See also *Bookwalter v. Mayer,* 345 F.2d 476, 480 (8th Cir. 1965). Similarly, it appears in these cases that the IRS denial of petitioner's application to revoke its section 185 election was an attempt to strong-arm the IRS interpretation in disregard of the developing case law. That case law, in turn, discerned a congressional purpose to allow depreciation and the investment tax credit where adequate evidence of useful life and eligible costs was presented. (Those matters have been stipulated here.) We conclude that the denial of petitioner's application was an abuse of discretion, and the election may be disregarded for years subsequent to 1976.

## Sidetrack Deposits

Respondent argues that deposits received by petitioner's railroads for the construction of sidetracks pursuant to the industry track agreements constitute income to petitioner at the time the railroads completed construction under the

agreements. Because this position of respondent is a modification of the determination in the statutory notice and positions taken at other times prior to respondent's trial memorandum, petitioner argues that the issue is not properly before the Court or respondent should bear the burden of proof. Petitioner further argues that respondent has not satisfied the burden of proof because she did not present any witnesses on this issue.

Respondent acknowledges that she has the burden of proof with respect to increased deficiencies. She notes, however, that the issue may be decided as a matter of law because all the facts necessary for a determination on the merits have been stipulated. We agree with respondent that the allocation of the burden of proof in these cases does not have any significance. We also agree with respondent that the issue of whether sidetrack deposits constitute income during the years in issue is properly before the Court, regardless of refinements of respondent's position with respect to the timing and amount of such income.

In several cases, the Board of Tax Appeals held that sidetrack deposits such as those in issue here did not constitute income when received by the carrier railroad. *Kansas City Southern Ry. v. Commissioner,* 22 B.T.A. 949 (1931), revd. on other grounds 75 F.2d 786 (8th Cir. 1935); *Kansas City Southern Ry. v. Commissioner,* 16 B.T.A. 665 (1929), affd. in part and revd. in part on other grounds 52 F.2d 372 (8th Cir. 1931); *Great Northern Ry. v. Commissioner,* 8 B.T.A. 225 (1927), affd. on other grounds 40 F.2d 372 (8th Cir. 1930). Respondent argues that the rationale of these cases has become obsolete in view of the Supreme Court opinion in *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 431 (1955), which broadened the definition of income to include all "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." See also *Teleservice Co. of Wyoming Valley v. Commissioner,* 27 T.C. 722 (1957), affd. 254 F.2d 105 (3d Cir. 1958).

Although there may have been significant developments in the law subsequent to the opinions of the Board of Tax Appeals, the most comprehensive cases dealing with the taxability of customer deposits culminated in the opinion of the Supreme Court in *Commissioner v. Indianapolis Power &*

*Light Co.,* 493 U.S. 203 (1990). The meaning of the phrase "complete dominion" used in *Commissioner v. Glenshaw Glass Co., supra,* was specifically placed in the context of customer deposits by the Supreme Court holding that deposits acquired subject to an express obligation to repay were not within the complete dominion of the recipient. *Commissioner v. Indianapolis Power & Light Co.,* 493 U.S. at 209; see *Oak Industries, Inc. v. Commissioner,* 96 T.C. 559, 567-568 (1991). Both the Supreme Court and this Court have rejected contentions by respondent that control over the deposits, unrestricted use of the funds, and nonpayment of interest negated the obligation to repay or demonstrated complete dominion over the deposits. *Oak Industries, Inc. v. Commissioner,* 96 T.C. at 569-570.

Petitioner argues that the key test of taxability after *Commissioner v. Indianapolis Power & Light Co., supra,* is whether the taxpayer has some guarantee that he will be allowed to keep the money. 493 U.S. at 210. Based on the stipulated facts in these cases, as set forth in our findings, there is no basis for concluding that petitioner was guaranteed that it could keep the money represented by the deposits simply because the construction covered by the agreement was completed.

Respondent argues that the facts in *Indianapolis Power & Light Co.* and in *Oak Industries, Inc.* are distinguishable from the facts in these cases because:

the refund of the deposit in *Oak Industries,* as in *Indianapolis Power,* was controlled by the customer; if the customer had otherwise complied with the service agreement, then the customer in each of those two cases could receive a refund of the deposit simply by discontinuing service * * * [and] no return of the sidetrack deposit would occur if the customer simply decided not to continue to do business with the railroads.

Respondent has given us no reason why this distinction should make a difference under the rationale of *Commissioner v. Indianapolis Power & Light Co., supra,* and such attempted distinctions were expressly rejected in *Oak Industries, Inc. v. Commissioner,* 96 T.C. at 571-572 (the taxpayer's right to keep the customer deposits depended upon the customer's decision actually to purchase), at 573-574 (in *Indianapolis Power & Light Co.,* only a portion of the customers were required to make deposits, whereas, in *Oak Industries,* all subscribers were required to pay deposits), and at 575-576 (the distinction

between prepaid rental and security deposits under leases is not a helpful analogy).

In summary, we repeat and paraphrase the conclusion in *Oak Industries, Inc. v. Commissioner,* 96 T.C. at 577: The taxpayer's unrestricted use of the deposits is not "dispositive", and its failure to pay interest on the deposits is not "especially significant" in determining whether a taxpayer had "complete dominion" over the security deposits. *Commissioner v. Indianapolis Power & Light Co.,* 493 U.S. at 209-210. "The key is whether the taxpayer has some guarantee that he will be allowed to keep the money." *Id.* at 210. Petitioner did not have any guarantee that it could keep the deposits because the customer controlled whether his deposit would be refunded. Lacking such a guarantee, petitioner did not have sufficient rights in the deposits for the deposits to be taxable income upon receipt.

For the same reasons, even after completion of construction in these cases, the customer controlled whether the conditions for refunds of the deposit would occur, so the completion of construction is not, standing alone, an appropriate event for recognizing income from sidetrack deposits. No alternative time of recognition of income from unrefunded deposits during the years in issue is now asserted by respondent.

There is no reason, therefore, to conclude that the holdings of the cases of the Board of Tax Appeals dealing with sidetrack deposits are erroneous or that the rationale of *Indianapolis Power & Light Co.* and *Oak Industries, Inc.* is inapplicable to the facts of these cases. For the years in issue, petitioner is not required to adjust its income to reflect sidetrack deposits received from industry shippers.

## Computer Software

Petitioner claims that the computer software purchased by it constituted tangible personal property within the meaning of section 48 and was therefore eligible for investment tax credit under section 38. Petitioner requests that we reconsider our decision in *Ronnen v. Commissioner,* 90 T.C. 74 (1988), and subsequent cases holding that computer software is intangible personal property not eligible for the investment tax credit.

Respondent relies on *Ronnen* and similar cases, i.e., *Alexander v. Commissioner,* 95 T.C. 467 (1990); *Gantner v. Commissioner,* 91 T.C. 713 (1988), affd. 905 F.2d 241 (8th Cir. 1990); *Smith v. Commissioner,* T.C. Memo. 1988-420. Respondent also asserts that petitioner failed to meet its burden of proof under Rule 142(a) because there is no evidence properly before the Court that establishes that petitioner's computer software was tangible personal property.

Petitioner's position is that the software was necessary for use of the computer hardware owned by petitioner or its subsidiaries and that the holdings of prior cases were or should be limited to the tax shelter situations in which they arose. Petitioner also harshly criticizes our opinion in *Ronnen v. Commissioner, supra.* We are not persuaded, however, that *Ronnen* is either inapplicable or erroneous.

In *Ronnen,* the Court dealt with the issue of whether computer software is tangible personal property or other tangible property eligible for investment tax credit as one of first impression. We stated:

> Computer software has both tangible and intangible characteristics. The tangible components of the software include the medium upon which the software exists, such as the original tapes and computer disks. Its intangible aspects include any information stored on the tangible disk or tape, i.e., the computer program. [90 T.C. at 96-97; fn. ref. omitted.]

We then examined the legislative history and regulations relating to sections 38, 46(a), and 48 and found little guidance. The Court reviewed the taxpayers' claimed analogies to various cases, such as *Walt Disney Productions v. United States,* 480 F.2d 66 (9th Cir. 1973), cert. denied 415 U.S. 934 (1974), and *Texas Instruments Inc. v. United States,* 551 F.2d 599 (5th Cir. 1977), affg. in part and revg. in part 407 F. Supp. 1326 (N.D. Tex. 1976), relied on by petitioner here, and concluded that the appropriate test was the "intrinsic value" test adopted by the Fifth Circuit. Under that test, "property is intangible if its intrinsic value is attributable to its intangible elements rather than to any of its specific tangible embodiments." *Texas Instruments Inc. v. United States,* 551 F.2d at 609.

Petitioner presented no evidence, expert or otherwise, that would allow us to conclude that the intrinsic value of the computer software in these cases was attributable to its

tangible elements rather than to the intangible information stored on the software. Cf. *Computing & Software, Inc. v. Commissioner,* 64 T.C. 223, 233-234 (1975). In this context, we infer that petitioner could not present such evidence.

Instead, petitioner attempts to distinguish or discredit *Ronnen v. Commissioner, supra,* arguing that it should receive a narrow application. Petitioner argues that petitioner's computer hardware could not be used for its intended purpose without the software and that, therefore, the facts are distinguishable from those in *Ronnen,* where the taxpayers were engaged in marketing the software, rather than using it in its own computers. Petitioner also argues that we should look to State law and that, under the law of the State of Missouri, computer software is tangible property. *International Business Machines Corp. v. Director of Revenue,* 765 S.W.2d 611 (Mo. 1989).

Petitioner has given us no reason for concluding that the classification of software as tangible or intangible should depend on whether the taxpayer is the owner or the user of the software. We discern no justification for making a distinction on that basis. Similarly, petitioner has given no reason for injecting State law into this matter of Federal taxation and has cited no authority for the proposition that State law should be followed in this context. To the contrary, categorizations of property for purposes of the investment tax credit must occur under Federal law, with due consideration of the Federal legislative language and purpose. Cf. *Garnac Grain Co. v. Commissioner,* 95 T.C. 7, 32 (1990). The flavor of petitioner's critical comments about our opinion in *Ronnen v. Commissioner, supra,* is shown by its suggestion that it is "bizarre" to use the test from a case such as *Texas Instruments Inc. v. United States, supra,* holding in favor of a taxpayer, to hold against the taxpayers in *Ronnen.* These arguments are unimpressive and unpersuasive. To the extent that petitioner's rhetoric relies on general counsel memoranda preceding statutory changes, proposed but unpublished revenue rulings, and private letter rulings, it presents interesting history but neither authority nor precedent. There is no reason, therefore, to reconsider our holding in *Ronnen* or to conclude that it is either incorrect or inapplicable to the facts in these cases, and we decline to do so.

To reflect the issues settled by the parties and our determinations as set forth above,

*Decisions will be entered under Rule 155.*