TEXAS INSTRUMENTS INCORPORATED AND ITS CONSOLIDATED SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVEUNE, RESPONDENT

Docket No. 32707-88.          Filed May 27, 1992.

*John S. Nolan, Alexander Zakupowsky, Jr., Jean A. Pawlow, Robin L. Greenhouse,* and *Robert E. Liles II,* for petitioner.

*Deborah A. Butler, John S. Repsis,* and *Gary D. Kallevang,* for respondent.

COHEN, *Judge:* In our Memorandum Findings of Fact and Opinion filed this date, we separately discussed and decided three issues. The issue discussed in this opinion is whether petitioner's speculative data tapes were property described in section 48(a)(2)(B)(vi) and therefore eligible for the investment tax credit (ITC). The ITC was not claimed on petitioner's return. We address this issue separately because it has not been previously decided. Unless otherwise indicated, all

section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. We also incorporate by this reference other agreed facts with respect to this issue that were submitted by the parties in a post-trial stipulation process.

Texas Instruments Inc. (petitioner) was a publicly held corporation organized under the laws of Delaware with its principal place of business in Dallas, Texas. Petitioner was an accrual method taxpayer that employed other specialized accounting methods in reporting various items of income and expenses for Federal income tax purposes. Petitioner timely filed consolidated Federal income tax returns (Forms 1120) for the taxable years ended December 31, 1980, December 31, 1981, and December 31, 1982.

Geophysical Service Incorporated (Geophysical) and Geophysical Service Inc. (GSI) were U.S. subsidiaries of petitioner and members of its consolidated return group for 1980, 1981, and 1982. GSI and Geophysical were in the business of collecting and processing, respectively, onshore and offshore seismic data on an exclusive and nonexclusive basis. GSI and Geophysical were not otherwise involved in the oil drilling or bidding business and did not have any ownership, working, or royalty interests in any onshore or offshore real property used for developing, removing, or transporting oil and gas.

Seismic data was used by petitioner's customers to define the subsurface for locating traps with hydrocarbons, which was one step in the exploration of oil and gas. To collect offshore seismic data and information, GSI introduced, at or near the ocean surface, acoustic impulses that traveled down to the seabed and underlying rock and, in turn, were reflected back from the various rock layers within the subsurface. At the surface, the reflected sound energy was picked up by a device aboard a collection vessel that converted the sound signals into electric signals that were amplified and recorded on magnetic tapes (field tapes).

The field tapes were off-loaded from the collection vessel and transported to a processing facility where Geophysical edited the seismic information and put it into a form useful to geophysicists. This edited version of the seismic data was rendered onto output tapes. The digital information contained on the output tapes was converted and the seismic data and information were placed on original analog film. (The field tapes, output tapes, and original analog film are hereinafter referred to collectively as speculative data tapes.) When plotted on paper or on the analog film, each line of data recorded on the output tapes showed up as a squiggle on the seismic map (wiggle traces), and this collection of wiggle traces provided a picture of a cross section of the subsurface in two dimensions.

GSI entered into exclusive agreements with various oil companies to collect and process seismic data. Under these exclusive agreements, the oil company set the conditions for the data collection and data processing, and the seismic data and information were collected solely for use by that oil company. GSI turned over to the oil company the speculative data tapes and all the maps from the survey, and GSI did not retain any copy of those tapes or maps.

GSI was also in the nonexclusive or speculative seismic data business in which GSI laid out a survey and collected seismic data on its own initiative. GSI entered into nonexclusive agreements with customers (usually oil companies) whereby the customers obtained a right to use all or a portion of the seismic data and information from that survey. These nonexclusive agreements, which were generally entitled "License Agreements", typically required GSI to supply to its customers a "Basic Data Package". As part of that package, GSI provided to the nonexclusive customers the maps, Mylar films, paper sections, and film sections. Additional information, including copies of the speculative data tapes, could be purchased for an additional cost.

Disclosure by the customer of seismic data and information received pursuant to the nonexclusive agreements was subject to the terms set forth in the nonexclusive agreements. The nonexclusive customer was expressly prohibited from disclosing such data and information other than to a subsidiary or parent or to a successor in interest or joint bidding partner in

certain limited circumstances. Nonexclusive customers were not required to return the data and information that they received under the nonexclusive agreements, but the agreements provided that all of the data and information delivered to the nonexclusive customer were proprietary to GSI. GSI also retained ownership of the original speculative data tapes and the right to enter into additional nonexclusive agreements with other customers with respect to the same data and information. Pursuant to the nonexclusive agreements, petitioner intended to license to its nonexclusive customers the seismic data and information, which was transferred to their customers on the copies of the speculative data tapes.

During the years in issue, GSI conducted five speculative seismic surveys: The Search Prudhoe 1977 survey, the Search Prudhoe 1981 survey, the North Aleutian Shelf 1981 survey, the Hope Basin 1981 survey, and the Amak Basin 1982 survey. All five of these surveys were conducted on the Outer Continental Shelf. The speculative data tapes for these five surveys were stored in Calgary, Alberta, Canada, and were physically located outside the United States more than 50 percent of the time during 1980, 1981, and 1982.

GSI entered into nonexclusive agreements similar to those described above with customers for the use of the seismic data and information collected and processed in those five speculative seismic surveys. That is, GSI retained ownership and possession of the speculative data tapes and licensed the seismic data and information thereon to its customers on a nonexclusive basis. Petitioner's customers used that licensed seismic data and information, which was delivered to them on copies of the speculative data tapes, to explore for resources on the Outer Continental Shelf.

There were occasions when a customer requested, and GSI delivered, speculative seismic data on a line-by-line basis. A single line of survey could provide geophysicists with sufficient information to enable them to recommend to their management whether to bid for a lease. Geophysicists would not ordinarily make such a recommendation because the chances of finding the traps were better if more seismic data was used. The speculative seismic data and information from the five speculative seismic surveys at issue were collected and processed on a line-by-line basis and were ready and available

for delivery to GSI's customers as soon as GSI had completed the data processing on any one line. Without processing, the seismic data and information would not be ready to deliver to a customer.

Data collection from the Search Prudhoe 1977 survey was completed prior to the years in issue. The field tapes were reprocessed in 1980 and 1981 because of the availability of a new processing program, and GSI produced new output tapes. Ninety-eight percent of the processing was completed in 1980, and the remainder of the processing was completed in 1981.

Seismic data collection and processing for the North Aleutian Shelf 1981 survey and the Hope Basin 1981 survey began and were completed in 1981. Seismic data collection for the Search Prudhoe 1981 survey began and was completed in 1981. All of the processing for the survey began and was completed in 1982. Seismic data collection and processing for the Amak Basin 1982 speculative survey were completed in 1982.

For 1980, 1981, and 1982, the field offices of GSI and Geophysical were directed to submit information as to the amounts that had been spent regarding speculative data. Also to be submitted were the number and cost of surveys undertaken, the amount of data collected, and the information as to where the data was physically located. With respect to the five speculative seismic surveys at issue, the following data collection and processing costs were incurred:

| Survey | Data collection | | Data processing |
|---|---|---|---|
| | | *1980* | |
| Search Prudhoe 1977 | - - - | | $260,000 |
| | | *1981* | |
| Search Prudhoe 1977 | - - - | | 5,306 |
| North Aleutian Shelf 1981 | $448,000 | | 228,011 |
| Hope Basin 1981 | 1,447,000 | | 717,282 |
| Search Prudhoe 1981 | 517,000 | | - - - |
| | | *1982* | |
| Search Prudhoe 1981 | - - - | | 350,800 |
| Amak Basin 1982 | 357,600 | | 243,500 |

In its petition, petitioner raised an affirmative claim that it is entitled to the ITC with respect to the data collection costs and data processing costs incurred in creating the speculative data tapes from those five seismic surveys.

OPINION

Petitioner claims that the speculative data tapes from the five speculative seismic surveys are tangible personal property within the meaning of section 48 and are therefore eligible for the ITC. (References to petitioner in this opinion are to petitioner, GSI, and/or Geophysical.) Section 48(a)(2)(A), for the years in issue, provided that section 38 property did not include property that was "used predominantly outside the United States." The speculative data tapes were physically located in Canada more than 50 percent of the time during the years in which the credits were claimed and were therefore used predominantly outside the United States within the meaning of that section. See sec. 1.48-1(g)(1)(i), Income Tax Regs.

Section 48(a)(2)(B), however, excluded from the scope of section 48(a)(2)(A) certain property, including:

any property (other than a vessel or aircraft) of a United States person which is used for the purpose of exploring for, developing, removing, or transporting resources from the Outer Continental Shelf (within the meaning of section 2 of the Outer Continental Shelf Lands Act, as amended and supplemented; (43 U.S.C. 1331)); [Sec. 48(a)(2)(B)(vi).]

Therefore, petitioner must establish that the speculative data tapes are tangible personal property and that they are property that was used for one of the purposes enumerated in section 48(a)(2)(B)(vi). If so, petitioner must also establish that the speculative data tapes were placed in service in the year claimed and the costs included in the basis upon which the credit was calculated.

In *Texas Instruments Inc. v. United States,* 551 F.2d 599 (5th Cir. 1977), the Court of Appeals for the Fifth Circuit dealt with the issue of whether data tapes and films upon which seismic information was recorded were tangible personal property. The Court of Appeals stated that such property was "intangible if its intrinsic value is attributable to its intangible elements rather than to any of its specific tangible embodiments." *Id.* at 609. Applying that test, the Court of Appeals held that the seismic data tapes and films were tangible personal property. In reversing the District Court's holding that the seismic data tapes and films were not tangible personal property, the Court of Appeals explained:

The District Court assumed, we feel mistakenly, that the resultant property in which taxpayer was investing was intangible information. This assumption is based on the premise that the seismic information is the "property" used by GSID in its business. This premise is incorrect. GSID uses only the data tapes and films to produce copies to sell to its customers. Its customers purchase the seismic data tapes and films to obtain the seismic information. * * *

* * * the value of the seismic data is entirely dependent upon existence of the tapes and film. If the tapes and film were destroyed prior to any reproduction of the film analog, nothing would remain. An investment in the data simply does not exist without recording of the data on tangible property. Thus the basis of the tangible tapes and films must include the costs of collecting * * * seismic data and recording it on the tangible property, with the result being an asset constituting "tangible personal property."

* * * The seismic data tapes and films are admitted by the government to be tangible. They have intrinsic value because the seismic information thereon does not exist as property separate from the physical manifestation. The seismic data tapes and films are tangible personal property used by GSID in its business of producing copies for sale. The entire cost of producing such tapes and films must be included in the basis upon which investment tax credit should be allowed.

[*Texas Instruments Inc. v. United States, supra* at 611.]

There is no factual ground upon which to distinguish the seismic data tapes and films from the speculative data tapes at issue in this case, and respondent has not argued that we should not follow *Texas Instruments Inc. v. United States, supra.* We therefore conclude that the speculative data tapes in this case are tangible personal property within the meaning of section 48(a)(1)(A). We now must determine whether those tapes were "property" of a United States person that was "used for the purpose of exploring for" resources on the Outer Continental Shelf within the meaning of section 48(a)(2)(B)(vi).

Petitioner contends that these speculative data tapes "fall precisely within the terms of section 48(a)(2)(B)(vi)." Petitioner argues that, if "used for" one of the purposes specified in that section, "the property automatically qualifies, irrespective of where it is stored, whom it is used by, or by what means its use is provided or occurs."

Respondent contends that petitioner was a mere vendor and that it "sold" the seismic data and information generated from the speculative data tapes. Alternatively, respondent contends that petitioner's construction of section 48(a)(2)(B)(vi) is too broad and that petitioner did not meet the requirements of

that section because it did not use those tapes for any of the required purposes.

We reject respondent's assertion that petitioner "sold" the seismic data and information to its nonexclusive customers. Petitioner retained substantial rights with respect to that data and information that are indicative of a license and not a sale. Although petitioner granted to the contracting parties the right to allow certain related entities also to use that information, it otherwise had the exclusive right to control the unauthorized disclosure of that data and information. See *E.I. duPont de Nemours & Co. v. United States,* 432 F.2d 1052, 1056 (3d Cir. 1970); *Taylor-Winfield Corp. v. Commissioner,* 57 T.C. 205, 215-216 (1971), affd. 467 F.2d 483, 471 F.2d 654 (6th Cir. 1972); see also *Commercial Solvents Corp. v. Commissioner,* 42 T.C. 455, 469 (1964). Further, petitioner retained ownership of the original speculative data tapes and the right to enter into additional nonexclusive agreements with other customers with respect to that same data and information. Thus, even though there was no provision in the agreements for the return of the copies of the tapes that were transferred and upon which the seismic data and information were copied, the customers did not obtain the exclusive right to use all or a portion of the seismic data and information. Cf. *Resorts International, Inc. v. Commissioner,* 511 F.2d 107, 111-112 (5th Cir. 1975), affg. in part, revg. in part 60 T.C. 778 (1973). The substance of the agreement indicates that the seismic data and information were licensed and not sold. Cf. *Bryant v. Commissioner,* 399 F.2d 800, 804-805 (5th Cir. 1968), affg. 46 T.C. 848 (1966). We therefore conclude that, as in *Texas Instruments Inc. v. United States, supra,* petitioner licensed the seismic data and information to its nonexclusive customers pursuant to written agreements.

Petitioner contends that section 48(a)(2)(B)(vi) adopts an ultimate use test and that it does not matter that petitioner did not itself use the speculative data tapes for one of the purposes enumerated in that section. Petitioner asserts that "The owner of section 38 property is entitled to claim the investment tax credit for leased property" unless it elected, pursuant to section 48(d), to pass through the credit to the lessee of that property. Because it was the owner of the speculative data tapes and did not make such a pass-through

election, petitioner argues that it is entitled to the ITC. Here, however, petitioner did not lease the original speculative data tapes to its customers; rather, it licensed to its nonexclusive customers the seismic data and information that it collected and recorded on those originals. It is this distinction, in large part, that compels us to conclude that petitioner is not entitled to the ITC in this case.

As set forth at length above, the foundation of the conclusion of the Court of Appeals in *Texas Instruments Inc. v. United States, supra,* that the seismic tapes and films were tangible personal property and that the basis upon which the ITC was computed included the costs of the seismic data and information recorded thereon was that that intangible information did not exist as property separate from its physical manifestation in the original tapes and films. Those original tapes and films had intrinsic value in that the value of the taxpayer's investment in the seismic information was dependent upon the existence of those original tapes and films. Petitioner's argument that its nonexclusive customers used petitioner's (tangible personal) "property" for oil and gas exploration purposes disregards this distinction, which distinction requires us to reject petitioner's assertion that its "speculative data tapes were in fact used for exploration on the" Outer Continental Shelf.

As in *Texas Instruments Inc. v. United States, supra,* petitioner used the original speculative data tapes from the five speculative seismic surveys at issue, which are the (tangible personal) "property" to which section 48(a)(2)(B)(vi) refers, to produce additional copies of those tapes that its nonexclusive customers purchased to obtain the licensed information. Those copies and the information thereon were then used by the nonexclusive customers for exploration on the Outer Continental Shelf. Thus the "property" that petitioner owned for purposes of the ITC was not the property that its nonexclusive customers used for the exploration of resources on the Outer Continental Shelf within the meaning of section 48(a)(2)(B)(vi). That is, petitioner retained ownership and possession of the original speculative data tapes that it used to produce copies for sale to its nonexclusive customers who in turn used the licensed information thereon for such purposes. We recognize that this is a fine distinction but, in the light of the analysis of the Court of Appeals in *Texas Instruments Inc.*

*v. United States, supra,* it is a distinction that makes a difference and is one that we cannot ignore.

We also find support for this distinction in a series of cases, which dealt with taxable years prior to the effective date of the enactment of section 48(k), that held that motion picture films were tangible personal property for purposes of the ITC. *Bing Crosby Productions, Inc. v. United States,* 588 F.2d 1293 (9th Cir. 1979); *Walt Disney Productions v. United States,* 549 F.2d 576 (9th Cir. 1976); *Walt Disney Productions v. United States,* 480 F.2d 66 (9th Cir. 1973). In *Walt Disney Productions,* the Court of Appeals for the Ninth Circuit looked to the use of the master negatives, which were the tangible personal property, and not to the use of the prints copied therefrom and distributed for exhibition (the end product). The Court of Appeals explained that "The relevant use of a productive asset (the master negatives) lies in that asset's manufacturing role (creation of exhibition prints)" and that the use of the end product was not determinative for purposes of applying the predominant use test. *Walt Disney Productions v. United States,* 549 F.2d at 582. Similarly, it is appropriate here to focus on the use of the productive asset (the original speculative data tapes) and not on the use of the end product (the copies produced therefrom).

Petitioner also relies on section 1.48-4(a)(1)(i), Income Tax Regs., and argues:

> that where a lessee, the ultimate user of the property, uses the property predominantly outside the United States, the property is ineligible as section 38 property. Here, the use to which the tapes were put by GSI's licensees serves to qualify rather than disqualify the tapes as section 38 property. * * *

Section 1.48-4(a)(1)(i), Income Tax Regs., provides that "property used by the lessee predominantly outside the United States is not eligible for the election since, under paragraph (g) of sec. 1.48-1, such property is not section 38 property." Section 1.48-1(g)(1)(iii), Income Tax Regs., provides that the general rule in section 1.48-1(g)(1)(i), Income Tax Regs.:

> applies whether property is used predominantly outside the United States by the owner of the property, or by the lessee of the property. If property is leased and if the lessor makes a valid election under sec. 1.48-4 to treat the lessee as having purchased such property for purposes of the credit allowed by section 38, the determination of whether such property is physically

located outside the United States \* \* \* shall be made with respect to the taxable year of the lessee; however, if the lessor does not make such an election, such determination shall be made with respect to the taxable year of the lessor.

Thus the regulations do not support petitioner's position that an ultimate use test is appropriate.

We recognize that the classification of property as tangible or intangible does not depend on whether the taxpayer is the owner or user of the property. See *Kansas City Southern Industries, Inc. v. Commissioner,* 98 T.C. 242, 264 (1992). We are not persuaded, however, that we may disregard the taxpayer's failure to use the otherwise qualified tangible personal property for a purpose enumerated in the statute. That section 48(a)(2)(B)(vi) does not explicitly state that property must be used *by the taxpayer for* one of those purposes does not conclusively establish that an "ultimate use test" is appropriate. Cf. sec. 48(a)(2)(B)(vii).

We have also examined the congressional reports that accompanied the enactment of the 1962 Revenue Act, Pub. L. 87-834, 76 Stat. 960, and that explained section 48(a)(2)(B)(vi). They do not support petitioner's ultimate use test. The congressional reports accompanying the enactment of the 1971 Revenue Act, Pub. L. 92-178, 85 Stat. 497, which added section 48(a)(2)(B)(x), however, are instructive. That section, like section 48(a)(2)(B)(vi), provided that "any property (other than a vessel or an aircraft) of a United States person \* \* \* used in international or territorial waters in the northern portions of the Western Hemisphere" for the same purposes as enumerated in section 48(a)(2)(B)(vi) was also excluded from section 48(a)(2)(A). The Senate report explained:

Present law contains an exception for property of a United States person which is used for the purpose of exploring for, developing or transporting resources, from the Outer Continental Shelf. A credit would not, however, be available for drilling equipment, rigs, and barges which are used *by* United States persons in foreign drilling operations (which are off the Outer Continental Shelf).

  \*  \*  \*  \*  \*  \*  \*

Accordingly, \* \* \* the present provision \* \* \* is expanded to include any property (other than a vessel or an aircraft) of a United States person which is used in international or territorial waters for \* \* \* [those purposes].

[S. Rept. 92-437, 1972-1 C.B. 559, 576; emphasis supplied.]

We recognize that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price,* 361 U.S. 304, 313 (1960). The quoted statement, in our view, however, negates petitioner's argument that Congress intended to establish an ultimate use test in section 48(a)(2)(B)(vi). For these reasons, we reject petitioner's contention that we may disregard petitioner's failure to use the speculative data tapes for one of the purposes enumerated in that section.

Moreover, even if we were to look through petitioner to the nonexclusive customer, the long and the short of the matter is that those customers did not use the "property" of petitioner in their exploration efforts on the Outer Continental Shelf within the meaning of section 48(a)(2)(B)(vi). As explained above, the reference to "property" in that section is to tangible personal property (or other tangible property). In this case, as in *Texas Instruments Inc. v. United States,* 551 F.2d 599 (5th Cir. 1977), the tangible personal property of petitioner was the tangible media, the speculative data tapes upon which the seismic data and information were recorded. That "property" was used to produce copies for sale to the nonexclusive customers. Only those media upon which that information was copied and which were sold to those customers were used for the exploration of resources on the Outer Continental Shelf.

Thus, to adopt petitioner's interpretation, we would have to conclude that the property "of" a taxpayer is not the property that is required to be "used" for the enumerated purposes (and that the former property does not have to be used by the taxpayer claiming the credit). We cannot adopt such an interpretation. We therefore conclude that petitioner's speculative data tapes from the five speculative seismic surveys at issue were not property of a United States person that was used for one of the purposes enumerated in section 48(a)(2)(B)(vi) and are not property eligible for the ITC.

We have considered and reject petitioner's other assertions. To reflect the foregoing and our memorandum findings of fact and opinion filed this date,

*Decision will be entered under Rule 155.*